**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

FRANK BOBECK,                                  )
                                               )
            Plaintiff,                         )
                                               )
      v.                                       )      02: 06-cv-0692
                                               )
BROWNSVILLE AREA SCHOOL DISTRICT;              )
THOMAS HISIRO;                                 )
LAWRENCE L. GOLEMBIEWSKI; AND                  )
GERRY GRANT,                                   )
                                               )
            Defendants.

**MEMORANDUM OPINION AND ORDER OF COURT**

February 10, 2009

       Presently before the Court for disposition is the MOTION FOR SUMMARY

JUDGMENT, with brief in support, filed by Defendants, Brownsville Area School District,

Thomas Hisiro, Lawrence L. Golembiewski, and Gerry Grant (*Document Nos. 31 and 34*,

respectively), and the brief in opposition filed by Plaintiff, Frank Bobeck (*Document No. 47*).

       The issues have been fully briefed and the matter is ripe for disposition.  After a

careful consideration of the motion, the filings in support and opposition thereto, the memoranda

of the parties, the relevant case law, and the record as a whole, the Motion for Summary Judgment

will be granted.

**PROCEDURAL BACKGROUND**

       On May 26, 2006, Plaintiff, Frank Bobeck ("Plaintiff"), brought this action by the

filing of Complaint against Defendants in which he claims unlawful retaliation in violation of the

First Amendment of the United States Constitution.  In response to a Motion to Dismiss filed by

Defendants, Plaintiff filed an Amended Complaint on November 15, 2006.  Defendants have filed

the instant motion for summary judgment in which they argue that they are entitled to judgment as a matter of law on Plaintiff's claims because Plaintiff is unable to establish a *prima facie* case of unlawful retaliation. Alternatively, the individual defendants, Thomas Hisiro, Lawrence L. Golembiewski, and Gerry Grant, argue that they are each entitled to qualified immunity on all claims.

## BACKGROUND[1]

In 1993, Bobeck applied for a teaching position with the Brownsville Area School District ("School District"), but was rejected. Thereafter, he filed a lawsuit against the School District under the Veterans Preference Act, 51 Pa. C.S.A. § 7101, et seq. In 1998, following a jury trial in the Fayette County Court of Common Pleas, Bobeck prevailed on his claim, which resulted in the School District hiring Bobeck.

Bobeck commenced teaching for the School District at the start of the 1998-1999 school year and was assigned to teach Mathematics at the high school. During the 1998-1999 school year, Bobeck received a letter of reprimand from Brownsville High School Principal Herman Jackson related to various classroom management issues.

During the 2000-2001 school year, Bobeck agreed to a reassignment to teach technology, computer assisted drafting, and mechanical drawing at the high school. In October of

---

[1] These facts are taken from the Concise Statement of Undisputed Material Facts filed by Defendants (Document No. 33), which contains numbered paragraphs and citations to the record in accordance with Local Rule 56.1(B)(1). Plaintiff filed his own Counterstatement of Material Facts, but did not respond to each numbered paragraph of Defendant's submission, as required by Local Rule 56.1(C)(1). Moreover, Plaintiff does not appear to contest Defendants' facts; rather, he points to his own version of events. Pursuant to the Local Rules, Defendants' recitation of facts should be deemed admitted. W.D.Pa. Local Rule 56.1(E).

2001, Bobeck was transferred from his position as a high school technology teacher to a position as a middle school technology teacher. While Bobeck believed that he was involuntarily transferred, he chose not to file a grievance regarding the transfer. Shortly, after the reassignment, Bobeck learned that the middle school technology classes were to be taught in the high school auditorium.[2] When Bobeck realized that the assignment to teach the middle school students for 2001-2002 would require him to teach in the auditorium, he attempted to be reassigned back to the high school.

Dr. Grant[3] overruled Bobeck's request to return to the high school and ordered him to teach technology to the middle school students. During the first semester of the 2001-2002 school year, Bobeck taught middle school technology in the high school auditorium; during the second semester, Bobeck was assigned to teach technology in whatever classroom was available. Bobeck contends that for the classes he taught in 2001-2002, he did not have use of, nor access to, any technology-equipped classroom, nor any technology equipment or related materials or supplies.

Bobeck complained to Dr. Grant that he was not able to properly teach the technology course because he lacked an appropriately-equipped classroom and up-to-date supplies. During the fall of 2001, Bobeck also complained to his principal, Kevin Fortuna, and union representatives about the "inadequate" teaching environment.

---

[2]     Due to budgetary concerns, the School District decided to close the Redstone Middle School beginning with the 2001- 2002 school year, and transfer the Redstone faculty, staff, and students to the high school, a move which created a significant space shortage and resulted in some staff members sharing space and others teaching classes in the high school auditorium.

[3]     Gerry Grant, Ph.D., was the Superintendent for the School District from 2000 through 2003.

In November 2001, in preparation for the school's annual open house, Bobeck prepared several props out of cardboard and paper and labeled them as if they were various items of technology equipment. During the open house, Bobeck remained in the classroom and met with various parents and school board members. When he was questioned about the paper and cardboard props, Bobeck explained that the props represented equipment and supplies that were being denied to the students. No disciplinary action was taken against Bobeck following his display at the open house.

In January 2002, no action had been taken by the School District to improve the teaching environment for the middle school technology classes. Bobeck, in order to have a visual record, created a 1 minute and 27 second video, in which he filmed the auditorium, the seating area, the stage, his desk area, and an arrangement of props similar to the ones he had used for the open house.

The next month, in February 2002, Bobeck attended a four-day Student Assistance Program ("SAP") training in Uniontown, PA. The attendees at the training included teachers and union officials from several school districts. Bobeck brought the video with him and on the fourth day of the training, he showed it to the attendees at the close of the training session. At the SAP conference, there had been no discussion about the School District's teaching conditions or the teaching conditions at any particular school. Bobeck also had an extra copy of the video, which he gave to a representative of the Pennsylvania State Educational Association who was in attendance at the SAP conference.

In late March 2002, Bobeck was advised that a meeting was to be scheduled with him; Dr. Grant, the Superintendent; John Joseph, the Director of Curriculum; and Debbie Suba,

the Director of Pupil Services and Interim Principal; to address "administrative concerns." The meeting was held on April 3, 2002. During the meeting, the showing of the videotape at the SAP conference was discussed, as well as a number of other administrative matters, such as the failure of Bobeck to submit lesson plans, his turning in grades beyond the deadline, his discussion of personal incidents with students that were unrelated to lesson plans, his poor interpersonal relationships with staff members, and his failure to adapt instruction for special needs students. Following the meeting, Ms. Suba sent Bobeck a memorandum dated April 16, 2002, in which she stated that he would be monitored with regard to the concerns of the administration. However, no discipline in the form of a reprimand, suspension or other penalty was imposed on Bobeck following the April 3, 2002 meeting.

In a separate meeting with Dr. Grant, School Director Jim Brown, and Bobeck, Dr. Grant told Bobeck that she had heard about the video from five or six Superintendents whose staff members had seen it at the SAP conference. Dr. Grant told Bobeck that she was upset and embarrassed by the video.

Despite the April 2002 criticism over the video and other administrative concerns, Bobeck finished the school year with a satisfactory performance evaluation. Bobeck admits that to his knowledge no disciplinary action was taken against him by anyone at the School District for his showing of the videotape.

Prior to the start of the 2002-2003 school year, Dr. Thomas Hisiro was named as the new middle school principal, replacing the outgoing interim middle school principal, Debra Suba. Dr. Hisiro never mentioned to Bobeck the showing of the videotape during the previous school

year or any matters specifically related to Bobeck's complaints regarding the technology department or the lack of technology equipment.

During the 2002-2003 school year, Bobeck did not teach in the high school auditorium, but rather in one of three trailers acquired by the School District for instructional purposes.

On September 25, 2002, Bobeck met with Dr. Hisiro to discuss "issues relating to his performance and interaction with staff." In particular, Dr. Hisiro discussed a confrontation that Bobeck had with the school's security officer regarding the parking area; Bobeck's "ongoing negative disposition and comments," and the concern of the Bobeck's colleagues "toward his mental health and well-being." Exhibit M.

Two days later, on September 27, 2002, Dr. Hisiro sent a memorandum to Bobeck concerning his on-going dispute with Marie Hudak, and their cross-filing of harassment claims. Bobeck was instructed to eliminate his frequent visits and presence in the High School's main office. Both Bobeck and Hudak were instructed to avoid all contact with each other.

On October 11, 2002, Bobeck attended a conference with Dr. Hisiro, and a parent of a female eighth grade student, who was also in attendance at the conference. Apparently, Bobeck had told a misbehaving male student that he would let the female student (who was overweight) sit on him so that they would have to "scrape him up afterwards." At the conference, Bobeck offered an apology to the offended female student.

In January 2003, Bobeck inadvertently showed a film[4] to his technology class that contained inappropriate material, such as nudity and profanity. According to Bobeck, he did not know, prior to showing the film, that it contained material unsuitable for middle school aged students. Bobeck contends that he had previously seen the film on television and thought that the film version was identical to the televised version, which had not contained any unsuitable material. Bobeck believed that the movie provided insight into technology by showing the use of computers, but he did not discuss the matter with either the Principal, any administrators or other teachers before showing the film, nor did he inquire into the film's rating before he showed it to his class.

After learning that Bobeck had shown the film to his middle school students, Bobeck was ordered to submit to a psychological evaluation and was placed on paid leave. Following the completion of his psychological evaluation, Bobeck was reinstated. During the time that Bobeck was on paid leave, he never incurred any loss of pay and the School District took no action to terminate his employment.

On April 9, 2003, Dr. Grant notified Bobeck that he would be reinstated to his job, effective April 10, 2003. On the first day of Bobeck's return, Dr. Hisiro gave Bobeck a six-point performance improvement plan, which was to be in effect through the remainder of the school year. The Improvement Plan provided as follows:

"1.    The teacher is directed to refrain from comments or remarks that undermine the administration, school board and school personnel.

---

[4]    The film, *Time Cop*, is a futuristic exploration of how the technology of time travel might be applied to the field of law enforcement. Bobeck stopped showing the film after he observed that the film was inappropriate. The movie is a R-rated film.

2.    The teacher is directed to maintain effective classroom management.  The teacher will utilize travel throughout the classroom during each period to assure student attentiveness and an opportunity to check for understanding.

3.    The teacher will work toward developing positive rapport with the students.  The teacher is directed to refrain from making critical remarks that pertain to an individuals stature, appearance or background.

4.    The teacher will maintain a professional appearance at all times.  Shirts should be clean and not reflect stains (i.e. coffee, etc.).

5.    The teacher will provide meaningful instructional activities that reflect appropriate teaching strategies.

6.    The teacher will provide lesson plans that reinforce this directive. . . ."

Exhibit 20, Improvement Plan, April 10, 2003.

Four days after his return,  Bobeck received a memo from Dr. Hisiro dated April 14, 2003,  which addressed (1) an issue relating to a classroom chair being placed against Bobeck's classroom door from the inside, which fell down when Bobeck entered the classroom several minutes  late,  (2) an incident involving a remark made by Bobeck to a student regarding the dress code, and (3) a remark made by Bobeck to a substitute teacher which Dr. Hisiro believed to be inappropriate.

On May 12, 2003, Bobeck met with Dr. Hisiro regarding an incident in which Bobeck belittled a student in class by asking the remainder of the class whether they thought that the student was "cool," and another incident in which Bobeck told a student in the presence of a security staff member that the student was "worthless."

On June 5, 2003, Dr. Hisiro sent Bobeck a memorandum in which he detailed an incident which had been personally observed that day by Dr. Hisiro.  Ten minutes into a class period, Dr. Hisiro entered Bobeck's classroom and observed the class working on their computers.

Bobeck, however, was at his desk playing solitaire on his computer. Bobeck does not deny that the incident occurred.

Bobeck was issued an unsatisfactory rating from Dr. Hisiro at the conclusion of the 2002-2003 school year. Bobeck did not file a grievance with regard to the unsatisfactory rating or any of the other matters for which he had received anecdotal documentation during that school year.

On January 24, 2004, Bobeck received a memorandum from Dr. Hisiro related to a parent / student conference attended by Bobeck, Dr. Hisiro and a parent of a seventh grade male student, who was also in attendance. The student alleged that inappropriate comments were made by Bobeck such as "I can knock your head off," I"ll hang you," and "I can break you in half." The student also reported that Bobeck applied a pressure point martial arts technique to the student's lower neck /shoulder area at different times during the school year. At the conclusion of the meeting, Bobeck conveyed his apologies to the student and his parent for any action or comment that may have been inappropriate.

On March 2, 2004, Bobeck received a one-day unpaid suspension after he tripped over a student's foot while in the classroom and then intentionally kicked the student in return.

Following the 2003-2004 school year, Dr. Hisiro again evaluated Bobeck as unsatisfactory. Upon receipt of the second unsatisfactory rating, Bobeck had no discussions with Dr. Hisiro concerning his status with the School District. Bobeck did not file a grievance following the receipt of the unsatisfactory rating at the conclusion of the 2003-2004 school year. Two consecutive unsatisfactory performance ratings may be grounds for dismissal, but it does not

necessarily have to be grounds for a dismissal. A Performance Improvement Plan could also be imposed.

On June 4, 2004, Superintendent Golembiewski[5] ordered Bobeck to attend a meeting on June 10, 2004, with regard to his second consecutive unsatisfactory performance rating. Bobeck attended the meeting with his union representative, Jolene Hough. At the opening of the meeting, Ms. Hough asked whether the meeting constituted a *Loudermill* proceeding, to which Golembiewski replied in the affirmative. Ms. Hough then asked for an adjournment so that Bobeck could review his options, which request was granted. During his deposition, Bobeck testified that Golembiewski never said that the School District was going to terminate his employment; rather, it was his Union representative who informed him that there was the possibility that the School District could terminate his employment.

Shortly after the June 10, 2004, meeting, Bobeck came into Golembiewski's office and stated that he wanted to retire if Golembiewski could obtain payment for health care coverage from the Board of Directors for him. On July 13, 2004, Bobeck tendered his letter of resignation effective August of 2004.[6]

Effective from the date of his resignation from the School District, Bobeck has drawn a disability pension from the Pennsylvania State Education Retirement System. Since leaving the employment of the School District, Bobeck has worked exclusively for his family-owned

---

[5] Golembiewski became Superintendent at Brownsville Area School District in December of 2003.

[6] In his letter of resignation, Bobeck informed Golembiewski that he would like to continue with his health insurance coverage from the School District and acknowledges that he will have to pay the premiums each month for the coverage.

construction business, and he has neither acted as a substitute teacher nor worked at any other

school district, nor has he sought employment as a teacher at any other school district.


**STANDARD OF REVIEW**

A.        <u>In General</u>

Summary judgment should be granted "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(c).  Thus, the Court's task is not to resolve disputed issues of fact, but

to determine whether there exist any factual issues to be tried.  *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 247-49 (1986).  The non-moving party must raise "more than a mere scintilla of

evidence in its favor" in order to overcome a summary judgment motion.  *Williams v. Borough of*

*West Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (*citing Liberty Lobby*, 477 U.S. at 249).  Further,

the non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere

suspicions in attempting to survive a summary judgment motion.  *Id.* (*citing Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 325 (1986)).  Distilled to its essence, the summary judgment standard

requires the non-moving party to create a "sufficient disagreement to require submission [of the

evidence] to a jury." *Liberty Lobby*, 477 U.S. at 251-52.

The Court need not accept mere conclusory allegations, whether they are made in the

complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). In

deciding a motion for summary judgment, "the judge's function is not himself to weigh the

11

evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249.

B.        First Amendment Retaliation - Prima Facie Case

To prevail on a First Amendment retaliation claim brought pursuant to 42 U.S.C. § 1983, a plaintiff must establish that (i) he engaged in protected speech, (ii) his interest in the protected speech outweighs the employer's countervailing interest in promoting the efficiency of the public service it provides to its employees; and (iii) the protected activity was a substantial or motivating factor in the alleged retaliatory action. *Baldassare v. New Jersey,* 250 F.3d 188, 194-95 (3d Cir. 2001).

More recently, the United States Court of Appeals for the Third Circuit recognized that, in the public employer-employee context, the test has been significantly modified by the United States Supreme Court in *Garcetti v. Ceballos*, 547 U.S. 410 (2006) ("the First Amendment does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities.")  Accordingly, a public employee's statement is protected activity when (i) the employee is speaking as a citizen; (ii) the statement involves a matter of public concern; and (iii) the government employer does not have adequate justification for treating the employee differently from any other member of the general public as a result of the statement he or she made. *Garcetti v. Ceballos*, 547 U.S. 410,  - - -, 126 S.Ct. 1951, 1958 (2006).  When a public employee makes a statement pursuant to his or own "official duties," the public employee is not speaking as a citizen.

In *Reilly v. City of Atlantic City*, 532 F.3d 216 (3d Cir. 2008), the Court of Appeals

explained:

> The District Court evaluated [plaintiff's] First Amendment retaliation
> claim under the following three-step framework: (1) the employee must
> demonstrate that his/her speech is protected, that is, it addresses a
> matter of public concern and the "employee's interest in the speech
> outweighs" the employer's countervailing interest "in promoting
> workplace efficiency and avoiding workplace disruption" (i.e., the
> balancing test established in *Pickering v. Bd. of Educ.*, 391 U.S. 563, 88
> S.Ct. 1731, 20 L.Ed.2d 811 (1968)); (2) the employee must prove that
> his/her speech was "a substantial or motivating factor" in the retaliatory
> action against him/her, which, if proven; (3) shifts the burden to the
> employer to prove that the "allegedly retaliatory action would have been
> taken absent the protected [speech]." *Id.* at 514-15 (*quoting Springer v.
> Henry,* 435 F.3d 268, 275 (3d Cir.2006)).
>
> . . .
>
> In analyzing Reilly's retaliation claim, the District Court asked [only]
> whether Reilly's speech involved a matter of public concern and
> whether the *Pickering* balancing weighed in favor of Reilly. . . . We
> have stated that following *Garcetti*, [a] public employee's statement is
> protected activity when (1) in making it, the employee spoke as a
> citizen, (2) the statement involved a matter of public concern, and (3)
> the government employer did not have "an adequate justification for
> treating the employee differently from any other member of the general
> public" as a result of the statement he made [i.e., the *Pickering*
> balancing test]. *Hill v. Borough of Kutztown*, 455 F.3d 225, 241-42 (3d
> Cir.2006) (quoting *Garcetti*, 547 U.S. at 418.) *Garcetti* simply
> "narrowed the Court's jurisprudence in the area of employee speech" by
> further restricting the speech activity that is protected. . . . Here, the
> District Court concluded that Reilly's speech was a matter of public
> concern and that the *Pickering* balancing favored Reilly. *See Reilly*,
> 427 F. Supp. 2d at 515. Therefore, the effect of *Garcetti* in the context
> of this appeal is limited to the question whether Reilly spoke as a citizen
> when he testified at the Munoz trial.

*Reilly*, 532 F.3d at 224-25, 228 (parallel and other citations omitted).

**Discussion**

Plaintiff alleges that Defendants unlawfully retaliated against him after he engaged in numerous "instances of protected activity," *to wit:* his commencement in 1993 of a veterans preference lawsuit against the School District; his comments at the open house in November 2001; his presentation of a video to SAP trainees, and his complaints in 2001-2002 to school officials about the "inadequacies he confronted while attempting to teach technology to the middle school students in AY 01/02" and "the dire teaching environment he was subjected to." Pl's Br. at 2. These incidences of alleged protected speech will be addressed seriatim.

A.        The Veterans Preference Lawsuit

In a claim for retaliation under 42 U.S.C. § 1983, a plaintiff must establish a causal relationship between his or her protected activity and the retaliatory action. *See, e.g., Thomas v. Indep. Twp.,* 463 F.3d 285, 296 (3d Cir. 2006). In the instant case, Plaintiff alleges that Defendants retaliated against him because he filed and was successful in his veterans preference lawsuit, which resulted in his "forced hiring" by the School District. There is no dispute that Plaintiff's prior lawsuit demonstrates that he engaged in constitutionally protected speech and, thus, satisfies the first prong of the *prima facie* case. Accordingly, Plaintiff must next establish a causal relationship between his protected activity and the retaliatory action.[7]

_____

[7]        Defendants argue that Plaintiff also cannot meet this element because there was no adverse action as Plaintiff was never terminated or threatened to be terminated. Because the Court finds that Plaintiff has not demonstrated a causal connection, it has not considered whether Plaintiff actually suffered an adverse employment action.

14

Our appellate court has instructed that to establish the requisite causal connection, a plaintiff usually must prove either:

> (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link. In the absence of that proof the plaintiff must show that from the evidence gleaned from the record as a whole the trier of the fact should infer causation.

*Lauren W. ex rel. Jean W. v. Deflaminis,* 480 F.3d 259, 267 (3d Cir. 2007).

According to Plaintiff, he filed his veterans preference lawsuit against the School District in 1993. In 1998, following a jury trial, "Bobeck prevailed on his claim," which resulted in his "forced hiring by the School District." Plaintiff alleges that "[t]hree years after Bobeck successfully sued BASD and forced it to hire him, he was consigned to a completely dysfunctional teaching environment, against his will." Pl's Br. at 3.

The reassignment Plaintiff challenges as being retaliatory occurred, by Plaintiff's own admission, three years after he was hired by the School District. Thus, the temporal proximity between Plaintiff's prior lawsuit and "forced rehiring" and the challenged 2001 reassignment is not unusually suggestive so as to establish the requisite causal connection. The Court finds and rules that Plaintiff has made no showing that there was a causal connection between his prior lawsuit and "forced rehiring" and his teaching reassignment. Therefore, the motion for summary judgment will be granted on Plaintiff's claim that Defendants unlawfully retaliated against him because of his prior lawsuit.[8]

---

[8]     The Court also notes that Stella Broadwater, a member of the Board of School Directors when Bobeck was hired following his successful Veteran's Preference action, testified in her deposition that there was no reaction on the part of the Board

(continued...)

15

B.        The Open House / The Video Shown At The "SAP" Conference

          Bobeck contends that following the Open House and the presentation of the video at

the SAP Conference, he received a written warning from Defendants that he would be closely

monitored and subject to further disciplinary action.  Thereafter, he received a series of critical

memoranda from Dr. Hisiro, which resulted in unsatisfactory performance evaluations for the

2002-2003 and 2003-2004 school years.

          Courts employ a three-step analysis when balancing the First Amendment rights of

public employees against competing interests of their employers.  *Connick v. Myers*, 461 U.S. 138,

146, 150-51 (1983); *Brennan v. Norton*, 350 F.3d 399, 412 (3d Cir. 2003).  First, a plaintiff must

establish that the activity in question was protected; second, the employer took an adverse action;

and third, that a causal link exists between the plaintiff's protected activity and the employer's

adverse action.  *Baldassare,* 250 F.3d at 194-95.  Under this framework, the first prong is a

question of law, while the second and third prongs are questions of fact.  *Hill v. Borough of*

*Kutztown*, 455 F.3d 225, 241 (3d Cir. 2006).

          To show that the speech was protected, Bobeck must demonstrate that his speech at

the Open House and the airing of the video were  "matter[s] of public concern" and that he spoke

as a private citizen.  The First Amendment protects statements made by public employees on

matters of public concern.  *Pickering v. Board of Ed. of Township High School District 205,* 391

U.S. 563, 573  (1968).  Indeed, "[a] public employee has a Constitutional right to speak on matters

of public concern without fear of retaliation." *Baldassare v. The State of N.J.*, 250 F.3d 188,

_____

          [8](...continued)
          in any negative fashion toward Bobeck because the Board had to follow the law.

16

194-195 (3d Cir. 2001)(*citing Rankin v. McPherson*, 438 U.S. 378, 383-84 (1987); *Feldman v. Phila. Hous. Auth.,* 43 F.3d 823, 829 (3d Cir. 1994) ("A state cannot lawfully discharge an employee for reasons that infringe upon that employee's constitutionally protected interest in freedom of speech.")).  "A public employee's speech involves a matter of public concern if it 'can be fairly considered as relating to any matter of political, social, or other concern to the community.' " *Green v. Phila. Hous. Auth.,* 105 F.3d 882, 885- 86 (3d Cir. 1997)(*quoting Connick v. Meyers*, 461 U.S. 138, 146 (1983)).  While speech related to "broad social or policy issues is a matter of public concern" *Sanguigni v. Pittsburgh Bd. of Pu. Ed.*, 968 F.2d 393, 397 (3d Cir.1992), speech that airs personal grievances is not considered a matter of public concern. *Swineford v. Snyder Co. Pa.* ., 15 F.3d 1258, 1271 (3d Cir. 1994).

Inquiry into "the speaker's motivation is relevant to the extent that it indicates whether the speaker is speaking as 'a citizen upon matters of public concern' or as a volunteer 'upon matters only of personal interest.' " *Versarge v. Township of Clinton New Jersey*, 984 F.2d 1359, 1364 (3d Cir. 1993) (*quoting Connick*, 461 U.S. at 147). "To presume that all matters which transpire within a[ ] [public school] are of public concern would mean that virtually every remark . . . would plant the seed of a constitutional case." *Connick*, 461 U.S. at 149.  It is well-settled in the Third Circuit that "speech disclosing public officials' misfeasance is protected while speech intended to air personal grievances is not."  *See Swineford*, 15 F.3d at 1271.

Although there is no bright line rule in this arena, courts are to "focus on the content, form, and context of the activity in question" in determining whether the speech warrants First Amendment protection.  *Baldassare,* 250 F.3d at 195.  In addition, while not determinative, courts are also to consider the speaker's motivation in making the statements.  *Cooper,* 175 F. Supp. 2d at

744 (*quoting Zamboni v. Stamler*, 847 F.2d 73, 78 (3d Cir. 1988) (citations omitted).  Because the First Amendment does not protect employees from discipline based on speech made pursuant to their official job duties,[9] the foregoing inquiries are relevant to determine whether the speech was made as " 'a citizen upon matters of public concern or as a volunteer upon matters only of personal interest.' " *Kadetsky v. Egg Harbor Twp. Bd. of Ed.*, 164 F. Supp. 2d 425, 435 (D.N.J.2001) (quoting *Versage v. Twp. of Clinton N.J.*, 984 F.2d 1359, 1364 (3d Cir. 1993)).

After considering the content, form, and context of Bobeck's speech, the Court finds that Plaintiff has failed to establish that his statements were made in his role as a citizen when he voiced his concerns.  Instead, the Court is persuaded that the summary judgment record establishes the opposite, that Plaintiff was speaking in connection with his official duties as a middle school teacher.   Indeed, it is not controverted that some, if not all of, Bobeck's concerns went to the very heart of the manner in which Bobeck carried out his job.  After considering the content, form, and context of the speech in question, and the likely motivation behind the speech, the Court finds that the speech at issue does not constitute a matter of public concern. Accordingly, Defendant's motion for summary judgment on Bobeck's claims of retaliation for his actions at the Open House and/or his showing of the video at the SAP conference will be granted.

---

[9]     "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 475 U.S. 410, - - -, 126 S.Ct. 1951, 1958  (2006).

C.        <u>Complaints Made to Administrators Concerning "Deplorable Teaching Conditions"</u>

Bobeck contends that he complained to his superintendent, principal, and union representative of the "deplorable teaching conditions"of teaching in the auditorium.[10]   However, the Court finds that Bobeck has simply failed to present any evidence to establish that Defendants forced him to resign as a result of these alleged complaints.   There is nothing in the summary judgment record which indicates that Bobeck's criticisms precipitated Dr. Hisiro's decision to give Bobeck consecutive unsatisfactory evaluations.  Instead, the record indicates that Dr. Hisiro's decisions had been taking shape as incidents with Bobeck and students escalated throughout the 2002-2003 and 2003-2004 school years.

Dr. Grant testified that Bobeck made her aware that he did not believe that he could properly teach his classes in the auditorium but that she also received similar complaints from the fine art and practical art teachers who were also compelled to teach their classes in the auditorium. In fact, Dr. Grant testified that all of the teachers who were required to teach in the auditorium made complaints to her, as did other teachers in the building who had previously had a classroom to themselves for the entire school day, but were now required to share classroom space.

The summary judgment record also reflects that Bobeck never went to any School Board meetings to complain about teaching in the auditorium and that he did not file any

---

[10]        However, when asked in his deposition to identify specific instances in which he registered complaints with the School District about the auditorium teaching conditions, Bobeck was unable to identify any particular instances apart from one visit to School Board Member Stella Broadwater's house in 2003.  Francine Pavone, a School Board Member for twenty-two years, testified that she was not aware that Bobeck had made any complaints about his teaching the technology course in the high school auditorium or that he made a videotape regarding the auditorium teaching conditions.

complaints with the Pennsylvania Department of Education regarding the auditorium teaching conditions.  When he discussed the matter with his Union president, Bobeck was told that all the teachers in the District were in the same position and that he would have to "tough it out."

Dr. Hisiro assumed the principalship at the middle school during the middle of the renovation project.  In his deposition, Dr. Hisiro testified that while an adjustment was necessary on the part of the faculty and students to the challenges posed by the renovation, they had to do their jobs within that environment and everyone understood that a collective sacrifice was being made to get a better facility.   Additionally, Dr. Hisiro testified that he had no reason to know of any concerns Dr. Grant may have had about Bobeck's performance before he assumed his duties as Principal in 2002, and had no knowledge of any concerns of anyone employed by the School District concerning Bobeck's performance before he became Principal.

Golembiewski became Superintendent at Brownsville Area School District in December 2003.  He testified in his deposition that during the first half of the 2003-2004 school year, he did not know that Bobeck had received an unsatisfactory evaluation from Dr. Hisiro at the conclusion of the 2002-2003 school year.  Golembiewski further testified that he had no intention of terminating Bobeck's employment after the 2003-2004 school year because Golembiewski had been Bobeck's supervisor for only six (6) months.

For these reasons, the Court concludes that Bobeck has failed to raise genuine issues of material fact as to whether his complaints were a substantial cause of the alleged retaliation, or whether Dr. Hisiro's decision to issue Bobeck successive unsatisfactory ratings would not have occurred but for Bobeck's speech.  Consequently, summary judgment will be granted on Bobeck's

claims of retaliation for his speech when complaining to his superiors about the teaching conditions at the middle school.

### CONCLUSION

As hereinabove discussed, the Court finds and rules that Plaintiff has not met his burden of establishing a prima facie case of retaliation. Therefore, the Motion for Summary Judgment filed by Defendants will be granted in its entirety. An appropriate Order follows.


McVerry, J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

FRANK BOBECK,               )
                                                 )
               Plaintiff,         )
                                                 )
          v.                     )     02: 06-cv-0692
                                                 )
BROWNSVILLE AREA SCHOOL DISTRICT;  )
THOMAS HISIRO;                      )
LAWRENCE L. GOLEMBIEWSKI; AND    )
GERRY GRANT,                       )
                                                )
               Defendants.

**ORDER OF COURT**

     **AND NOW**, this 10th day of February, 2009, in accordance with the foregoing

Memorandum Opinion, it is hereby **ORDERED, ADJUDGED AND DECREED** that the Motion

for Summary Judgment filed by Defendants Brownsville Area School District,  Thomas Hisiro,

Lawrence L. Golembiewski, and Gerry Grant  is **GRANTED** and judgment is hereby entered in

favor of Defendants Brownsville Area School District, Thomas Hisiro, Lawrence L.

Golembiewski, and Gerry Grant, and against Plaintiff, Frank Bobeck.

                                                 BY THE COURT:

                                                 s/Terrence F. McVerry
                                                 United States District Court Judge

cc:       Edward A. Olds, Esquire
            Email: edolds@earthlink.net

            Richard S. Matesic, Esquire
            Email: rs.matesic@verizon.net

            R. Russell Lucas , Jr., Esquire
            Maiello, Brungo & Maiello
            Email: rrl@mbm-law.net